# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION
## 2715 13th Avenue, Chattanooga, Tennessee

### INTRODUCTION

1.      I, James Hixson ("Affiant"), being duly sworn, depose and state as follows:

2.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") Field Office in Chattanooga, Tennessee. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.      I have been employed as a police officer with the Chattanooga Police Department in Chattanooga, Tennessee, for approximately 23 years. I have been assigned as an investigator in the field of narcotics investigations for approximately 17 years. I am currently assigned as a Task Force Officer for the DEA Chattanooga Resident Office. I have been a Task Force Officer for approximately 14 years. During my tenure as an investigator assigned to narcotics investigations, I have gained a working knowledge of narcotics trafficking methods and techniques. My present duties include the investigation of violations of federal law by individuals involved in the sale and distribution of controlled substances.

4.      During my experiences and tenure as a narcotics investigator and Task Force Officer, I have investigated and participated in investigations of organized criminal groups violating federal drug trafficking laws. As part of my official duties, I have utilized most traditional law enforcement techniques, including: visual surveillance, witness interviews, execution of search warrants, the use of cooperating witnesses, seizure of drug evidence, controlled purchases of drug evidence, court-authorized pen registers, court-authorized interceptions of wire communications, and undercover techniques. I have debriefed numerous cooperating defendants

and confidential informants regarding the habits, practices, methods, and general behavior of criminal groups engaged in organized criminal activity. I have personally participated in Title III wire intercept investigations, including investigations involving large-scale drug trafficking organizations and drug traffickers. I have received specialized training in conducting drug investigations and have attended numerous conferences and lectures featuring government attorneys and law enforcement officials. Over the course of my career, I have participated in numerous arrests of known drug traffickers and their associates. This experience has afforded me an opportunity to observe and investigate methods, schemes, and operations used by organized groups, including the use of cellular telephones and of digital display paging devices, and their use of numerical codes and code words to conduct their transactions. In addition, I have participated in investigations concerning the concealment of proceeds of controlled substances, including assets, monies, and bank records, and the identification of co-conspirators through the use of drug ledgers, telephone toll records, telephone bills, photographs, and financial records. These investigations have resulted in the arrest of individuals who have smuggled, received, and/or distributed controlled substances, including methamphetamine, cocaine hydrochloride, cocaine base, heroin, and marijuana, as well as the seizure of controlled substances and the proceeds of the sale of these controlled substances. I know based upon my training and experience that narcotics traffickers and money laundering organizations routinely use several operational techniques. These practices are designed and implemented to achieve two paramount goals: first, the successful facilitation of the organization's illegal activities that consist of the transportation and distribution of controlled substances and subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization

2

members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

## **PURPOSE OF AFFIDAVIT**

1.    This affidavit is submitted in support of an application for a search and seizure warrant for a residence associated Charles BASS located at **2715 13th Avenue, Chattanooga, Tennessee**, further described in Attachment A of this affidavit.  Your Affiant and other law enforcement officers have corroborated information in furtherance of this investigation through the seizure of controlled substances, recorded telephone calls, interviews of confidential sources, and physical surveillance.  This affidavit does not include each and every fact known to your Affiant but rather contains sufficient facts to establish probable cause to support the search warrant application and order.

2.    Based upon your Affiant's training, experience, and participation in investigations involving controlled substances, your Affiant knows:

   a.   That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

   b.   That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

   c.   That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

   d.   That large-scale narcotics traffickers may maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

3

e.  That narcotics traffickers maintain books, records, receipts, notes ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That narcotics traffickers commonly "front" (provide  narcotics on consignment) controlled substances to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them;

f.  That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, their businesses and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

g.  That, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses.  That there are a number of publications available instructing where and how to build "stash" places.  Copies of these types of publications have been found in the residences of narcotics traffickers;

h.  That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and  related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers.  These items are

4

maintained by the narcotics traffickers within their residences, businesses or other
locations which they maintain dominion and control over;

i.  That large-scale traffickers often utilize electronic equipment such as computers,
facsimile machines, currency counting machines and telephone answering
machines to generate, transfer, count, records and/or store the information
described above;

j.  That when drug traffickers amass large proceeds from the sale of drugs that the
drug traffickers attempt to legitimize these profits through money laundering
activities.  To accomplish these goals, drug traffickers utilize, including but not
limited to, domestic and international banks and their attendant services, securities
brokers, professionals such as attorneys, and accountants, casinos, real estate,
shell corporations and business fronts and otherwise legitimate businesses which
generate large quantities of currency;

k.  That the sale of controlled substances generates quantities of United States
currency in small denominations (commonly referred to as "street money");

l.  That it is common for drug dealers to physically handle and count the "street
money" after receiving it in exchange for the controlled substances, thereby
leaving residue traces of controlled substances on the "street money." That law
enforcement agencies own dogs which are trained to react to the scent of
controlled substances and residue traces of controlled substances; and that those
trained dogs have reacted to narcotics tainted currency negotiated at banks and
concealed in the residences of narcotics traffickers;

m.  That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

n.  That the Currency Transaction Report (CTR) (IRS form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

o.  That, in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p.  That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government.  The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

6

q. That controlled substances traffickers commonly maintain addresses of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

r. That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product and that these traffickers usually maintain these photographs in their possession;

s. That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

t. That drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency;

u. That drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones. Such cell phones will also carry information in a SIM (Subscriber Identity Module) card, or some other type of electronic storage card, which will reveal the number of the cell phone and other information, leading to the identity of the user.

3. The investigation into Charles T. BASS, including court-authorized pen registers and court-authorized Title III intercepts indicate that BASS is a heroin (a Schedule I controlled substance) and fentanyl (a Schedule II controlled substance) dealer, operating in the

7

Chattanooga, Tennessee, and an area in or near Detroit, Michigan. BASS was intercepted on

court-authorized Title III intercepts of Orlando Watkins, which revealed numerous conversations

involving the illegal distribution of controlled substances. BASS's criminal history dates back to

2007, including arrests for "Weapons-Carrying Concealed" and "Dangerous Drugs," among

other offenses.[1] BASS's criminal history indicates that in 2016, BASS pled guilty to a felony

firearms charge in Detroit, Michigan. BASS was arrested again on April 04, 2018, for charges

relating to the violation of the terms of his probation.

### FACTS AND CIRCUMSTANCES GIVING RISE TO PROBABLE CAUSE THAT CHARLES BASS IS DISTRIBUTING ILLEGAL DRUGS AND UTILIZING 2715 13th AVENUE AS A BASE FOR THIS ILLEGAL BUSINESS

1.      On March 16, 2018, Hamilton County Criminal Court Judge Don Poole authorized the

interception of telephonic communications of Orlando Watkins. This authorization was the result

of an investigation into Monte Brewer, a heroin and fentanyl trafficker. During this court-

authorized intercept, agents identified the source of supply of heroin for Orlando Watkins, stash

locations utilized by Watkins, and other coconspirators. These intercepts confirmed that Watkins

was in fact distributing heroin and other illegal narcotics, and was involved in criminal gang

activities. Additionally, it was determined that Watkins and his associates were being provided

quantities of heroin by Charles T. BASS. During the authorized intercept of Watkins, there were

approximately 1,225 pertinent calls and text messages. The calls and other facts revealed later in

--------------------------------

[1]Watkins, a validated member of the Gangster Disciples, was intercepted throughout the court-authorized Title III intercepts of Monte Brewer, a distributor of heroin and fentanyl. Subsequent court-ordered interception of Watkins's telephone began on March 19, 2018, and continued to April 17, 2018.

this affidavit confirm that BASS and Watkins are utilizing 2715 13th Avenue in Chattanooga, Tennessee to conduct narcotics transactions.

a.      On March 19, 2018, the first day of the wiretap, BASS was first intercepted on the court-authorized intercept speaking with Watkins.  At the time, your Affiant had not identified BASS and only knew BASS to be a significant associate of Watkins.  In the call, Watkins asks BASS to pick up heroin for Watkins. Watkins states he had a tail light out on his vehicle and did not want to risk being pulled over by law enforcement while in possession of heroin.

b.      On March 26, 2018, BASS was intercepted calling Watkins. In the call, Watkins and BASS discuss the arrest of Jermel McKenzie.  McKenzie was arrested by the Chattanooga Police Department for possession of a firearm and several grams of fentanyl. Intercepts indicated that BASS and Watkins were concerned about McKenzie cooperating with law enforcement and knowing the location of the "Stash House."  Watkins and BASS discuss needing to kill McKenzie to keep him from cooperating with law enforcement. In the intercepted call, BASS tells Watkins that he needs to go to the "Stash House" and remove the narcotics and firearms stored at that location.  BASS goes on to say that the house is in "his name."  Later in the day, Watkins went to the residence and removed "a whole bag of food" and a "whop."  Based on your Affiant's training and experience, a "bag of food" refers to a bag of heroin. "Food" and "dog food" are common street names for heroin used by this drug trafficking organization. The "whop" is a common street name used by this organization for guns. Both Watkins and BASS are convicted felons and prohibited from possessing firearms.

9

c.       On March 28, 2018, BASS and Watkins were again intercepted discussing several of their associates being arrested with fentanyl. In the conversation, BASS tells Watkins that some of their associates were arrested in front of the house on 13th, which your Affiant believes to refer to the house located at **2715 13th Avenue**.

d.       On April 04, 2018, BASS was intercepted talking with Watkins. In this conversation, BASS refers to himself as "Mr. BASS" and discusses his recent arrest. BASS tells Watkins that the arrest was probation related and that his charges were dismissed. Watkins tells BASS that he needs BASS to supply him with heroin. BASS tells Watkins that it would not be long before he would be able to provide Watkins with heroin.

e.       On April 13, 2018, BASS and Watkins were intercepted discussing some of their customers purchasing $5000 in narcotics from another source. BASS and Watkins discuss their loyalty to one another and discuss retaliating against their customers for using another source of supply.  BASS was last intercepted calling Watkins on April 17, 2018, the last day of the court-authorized wiretap. In total BASS was intercepted 26 times on pertinent calls or text messages during the court authorized interception period.

### *Identification of Charles T. BASS*

2.       On April 18, 2018, TFO Watters and your Affiant reviewed intercepted conversations between Watkins and BASS, who identified himself as "Mr. BASS."  Based on the intercepted conversations, your Affiant knew the individual (1) referred to himself as "Mr. BASS," and (2) had a residence on 13th Avenue in his name.  Based on those intercepted conversations, TFO

10

Watters contacted the Electric Power Board (EPB). TFO Watters inquired as to power subscribers on 13th Avenue with the last name of BASS. The EPB inquiry revealed that Charles BASS was the subscriber for power at **2715 13th Avenue in Chattanooga**. The inquiry also revealed that BASS had the power at this residence since January 23, 2018, and personally provided the personal history information regarding BASS

3.      Upon receiving the name "Charles BASS" and his identifiers from the EPB inquiry, your Affiant confirmed, through a search of public and law enforcement databases, that the same Charles BASS also is associated with the Detroit, Michigan, area. A criminal history inquiry revealed that BASS was, in fact, arrested on April 04, 2018, for a probation related offense, which corresponds with the court-authorized intercepted call in which BASS and Watkins discuss his arrest. Additionally, BASS was intercepted on April 02, 2018, asking Watkins to meet his (BASS's) father at the house and provide the father illegal narcotics. Based on the intercepted call, your Affiant believed that BASS was not in Chattanooga, Tennessee at the time of this request. Your Affiant conducted an inquiry into a law enforcement database and found that target Charles BASS's father (also named Charles Terra Bass) resides in the Chattanooga, Tennessee, area.

4.      Later in the day on April 18, 2018, TFO Watters and your Affiant traveled to the area of **2715 13th Avenue in Chattanooga**. Upon arrival, your Affiant observed a blue single-family dwelling with three vehicles parked in the driveway. One vehicle was a maroon Cadillac bearing Tennessee temporary registration C803103. A blue Ford Explorer was also observed further toward the rear of the residence in the driveway. This vehicle displayed Tennessee temporary registration C191560. The other vehicle was a silver in color small sedan and was parked in the very rear of the residence.

11

5. After a brief period of surveillance, the maroon Cadillac was observed backing out of the driveway. The Cadillac was followed from **2715 13th Avenue** to 1101 E. 13th Street in Chattanooga, Tennessee. Upon arrival at this residence, the vehicle parked on the street in front of the residence. After a brief period of time, the Cadillac was observed leaving the residence. Based on your Affiant's training and experience, it appeared that the vehicle's occupants were attempting to conduct counter-surveillance.

6. On April 25, 2018, TFO Watters conducted surveillance of **2715 13th Avenue**. TFO Watters observed the maroon Cadillac once again at the residence. A short time later, TFO Watters noted the maroon Cadillac left the residence; however, a blue Dodge Avenger and a black Chrysler 300 had arrived. After a brief period of time, TFO Watters observed a male leave the residence in the Dodge Avenger. Within a minute, another male walked out of the residence and got into the black Chrysler 300 and left the residence. A registration inquiry into the vehicles revealed the Dodge Avenger was registered to Cortez Davis of Hixson, Tennessee. The black Chrysler 300 was registered to Tariku Bulit of Antioch, Tennessee. TFO Watters positively identified both as being the subjects observed exiting the residence and walking to their respective vehicles. Your Affiant was able to confirm that Davis is a validated member of the Gangster Disciples and a known narcotics distributor.

7. On Monday April 30, 2018, TFO Watters observed Watkins parked in the driveway of **2715 13th Avenue**. TFO Watters and your Affiant established surveillance on this residence and observed a silver Chevy Malibu arrive at the residence and park. TFO Watters observed a male exit the driver side of this vehicle and walk toward the driver's side of Watkins's vehicle, speak to a passenger of Watkins's vehicle and then return to the Malibu. Watkins then left the

12

residence as the driver of the Malibu entered **2715 13th Avenue**. Your Affiant obtained the registration of the Malibu and determined it was an Avis rental vehicle.

8.       Approximately 15 minutes later, TFO Watters observed Watkins return to **2715 13th Avenue**. A backseat passenger was observed getting out of Watkins's vehicle and enter the residence. Watkins then left the residence. TFO Watters then observed the driver of the Malibu along with another individual walk out of the front of the residence and leave in the Malibu. Based on your Affiant's training and experience, this activity is consistent with a drug transaction.

9.       On May 07, 2018, your Affiant conducted a toll analysis on the cellular phone utilized by Watkins. This toll analysis confirms that Watkins has maintained contact with the phone numbers intercepted during the court-authorized intercepts. Additionally, your Affiant noted that Watkins has maintained contact with BASS and last contacted BASS on May 07, 2018.

10.      The investigation has revealed that Watkins has been conducting drug trafficking activities at several known stash houses simultaneously during this same time period, specifically, 2210 Bennett Avenue, Chattanooga, Tennessee; 4512 Rogers Road, Duplex Side A, Chattanooga, Tennessee; and **2715 13th Avenue**, Chattanooga, Tennessee.  Throughout the authorized period of interception of Watkins, your Affiant and other law enforcement officers familiar with the investigation have conducted surveillance of Watkins at these stash houses and other various locations in between. For example, Watkins also observed meeting with individuals at 2210 Bennett Avenue, a known stash house, on several occasions throughout the interception and even after it concluded. On every surveillance of Watkins at 2210 Bennett Avenue, your Affiant has observed traffic consistent with narcotics traffic to and from the residence. Watkins has been observed meeting with people for very brief periods of time. Your Affiant has also

13

observed activity consistent with hand-to-hand narcotics transactions between Watkins and people he meets at 2210 Bennett Avenue. In total, approximately 22 calls involving Watkins, discussing meeting individuals on "Bennett" were intercepted during the court-authorized period of interception.

11.     On May 10, 2018, Officer C. Batterson of the Chattanooga Police Department pulled onto a gas station on 4th Avenue in Chattanooga, Tennessee. Upon arriving on the lot, Officer Batterson noticed several members of the Gangster Disciples street gang loitering on the lot, as well as Orlando Watkins's Camero. As previously discussed, Watkins is a confirmed member of the Gangster Disciples. As Officer Batterson pulled onto the lot, Watkins's Camaro reversed off the lot in an erratic manner and sped off toward Foust Street. At the time, Officer Batterson had just engaged a suspect on the lot and was unable to stop the Camaro. While on patrol later, Officer Batterson located the Camaro parked at **2715 13th Avenue.**

12.     On May 15, 2018, your Affiant conducted surveillance of 2210 Bennett Avenue. At approximately 8:30 PM, your Affiant observed a white Chevrolet sedan arrive at the residence. Your Affiant then observed Watkins get out of the vehicle and enter the residence. After a few minutes, Watkins came out of the residence and drove away in the Chevrolet sedan. Surveillance units followed Watkins to a residence on Peachtree Street near the intersection of 12th Street, which was notable because during the court-authorized intercept of Watkins, your Affiant intercepted calls in which Watkins met with a unidentifed black male on Peachtree Street for the purpose of distributing illegal narcotics to the unidentified black male. After a few minutes at the Peachtree Street residence, Watkins was followed to a restaurant on Dodds Avenue. Units established surveillance of Watkins at the restaurant where he remained for approximately 30 minutes. Watkins was then observed leaving the restaurant and traveled to a residence off Lee

14

Highway. Watkins stayed at this residence for a few minutes before leaving and traveling **to 2715 13th Avenue**. At **2715 13th Avenue**, your Affiant observed Watkins park the Chevrolet sedan in the driveway and enter **2715 13th Avenue** through the front door. Surveillance was discontinued to avoid alerting Watkins to the presence of law enforcement.

13.     The investigation has revealed that BASS's and Watkins's drug trafficking business has operated consistently and continuously over a significant period of time, unimpeded by law enforcement or rival disruption. Based upon my training and experience investigating illegal drug trafficking, it is virtually unheard of for established drug traffickers like BASS and Watkins, with a vigorous business and clientele, to suddenly cease operations without intervention of some kind. Thus, your Affiant believes that BASS's and Watkins's drug trafficking operation continues to this day in the same manner outlined above and as evidenced by Watkins's recent flight to BASS's residence at **2715 13th Avenue**, one of Watkins's regular stash houses, as well as Watkins's recent sitings at both the Bennett Avenue address and the 13th Avenue address, with the quick stop in between at an area Watkins has previously dealt drugs.

15

## **CONCLUSION**

1.      In summary, agents of the Drug Enforcement Administration have been investigating and have obtained a substantial amount of information regarding the drug trafficking activities of Orlando Watkins and Charles T. BASS, as well as their associates.  This investigation has revealed through law enforcement surveillance, the seizure of narcotics, and recorded telephone conversations that Watkins and BASS have been involved in the trafficking of significant amounts of heroin and other illegal narcotics for some time.  Your Affiant further submits that there is probable cause to believe Watkins and BASS utilize the residence at **2715 13th Avenue, Chattanooga, Tennessee,** to facilitate their drug trafficking activity through the storage and sales of narcotics.

2.      Your Affiant submits that probable cause exists to have the residence/premise/property, to include any and all outbuildings and vehicles located at the property, located at **2715 13th Avenue, Chattanooga, Tennessee**, in the Eastern District of Tennessee, searched for the following items (See Attachment B of this Affidavit):

   a.   Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

   b.   Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

   c.   Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and

16

other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

d.   United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

e.   Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances (marijuana and cocaine) to include but not limited to scales, baggies, packing material;

f.   Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

g.   The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

h.   Papers, tickets, notes schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

i.   Firearms;

j.   Cellular telephones present and used by the occupants of the residence, including BASS and cellular phones believed to be used by WATKINS, including the electronic address book, stored memory feature and the SIM card (or similar type of electronic data storage card) of the cellular telephone;

17

k.  Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1) and

846, which include manufacturing, possession with intent to distribute and

distribution of controlled substances; and of 18 U.S.C. § 1956, et seq, which

includes money laundering.

_____
Task Force Officer, James Hixson
Drug Enforcement Administration


Sworn to and subscribed before me this
_____ day of May,  2018.

Travis R. McDonough
United States District Judge
Eastern District of Tennessee

18

## ATTACHMENT A

**Description of the Residence/Premises/Property located at**
**2715 13th Avenue, Chattanooga, Tennessee**

The residence is single-family home located at 2715 13th Avenue Chattanooga, Tennessee.   The

residence is described as a single-story structure painted blue in color with white trim. The

residence has a detached garage with a dark colored garage door.  The number "2715" are on the

trim of the front door.

## ATTACHMENT B

**Items to Be Searched for at the Residence/Premises/Property of Located at
2715 13th Avenue, Chattanooga, Tennessee**

(1)     Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2)     Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3)     Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4)     United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5)     Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular cocaine and marijuana, including, but not limited to scales, baggies, packing material;

(6)     Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

(7)     The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

(8)     Papers, tickets, notes, schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9)     Firearms;

(10)    Cellular telephones, including the electronic address book, stored memory feature and the SIM card (or similar type of electronic data storage card) of the cellular telephone; and Pagers.

(11)    Any and all other material evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, and 881, which include manufacturing, possession with intent to distribute and distribution of controlled substances; and 18 U.S.C. § 1956, which includes money laundering.

2